**42-DEC Pa. Law. 22**

**Pennsylvania Lawyer**
November/December, 2020

**On the Cover**

Emeline E. K. Diener [a1]

Copyright © 2020 by The Pennsylvania Bar Association; Emeline E. K. Diener

# FINES AND PORTENTS: PENNSYLVANIA'S CRIMINALIZATION OF FORTUNE-TELLING AND MAGICAL RITUALS

**A**s provided in part at 18 Pa.C.S.A., Part II, Ch. 71, Sports and Amusements, Section 7104, *Fortune telling*, Offense defined. "A person is guilty of a misdemeanor of the third degree if he pretends, for gain or lucre, to tell fortunes or predict future events, by cards, tokens, the inspection of the head or hands of any person, or by the age of anyone, or by consulting the movements of the heavenly bodies, or in any other manner."

The statute has been in effect since 1861, most recently reenacted in 1939 and 1972.

The penalty is one year in prison or a $2,500 fine.

We aren't the only state that criminalizes fortune-telling for a fee; New York and Oklahoma do, too. Massachusetts regulates it by requiring that the seer be licensed and pay a license fee to the municipality, in which (s)he must have resided for at least a year. (Get that? The infamous town of Salem now licenses witches! Funny ol' world!)

In some states, anti-fortune-telling statutes have been invalidated on First Amendment grounds. In *Argello v. City of Lincoln*, (1998) the 8th U.S. Circuit Court of Appeals struck down an ordinance forbidding fortune-telling and divination as a content-based restraint on speech. In that case, the ordinance flatly prohibited fortune-telling whether done for a fee or gratis.

Under 18 Pa.C.S.A. 1704, it is not only prediction that is proscribed if done for "gain or lucre." Unlike other, briefer state statutes I have encountered, ours also criminalizes a person who "... for gain or lucre, pretends to effect any purpose by spells, charms, necromancy or incantation; or advises the taking or administering of what are commonly called love powders or **\*24** potions, or prepares the same to be taken or administered, or publishes by card, circular, sign, newspaper or other means that he can predict future events, or for gain or lucre pretends to enable anyone to get or to recover stolen property, or to tell where lost property is, or to stop bad luck or to give good luck, or to put bad luck on a person or animal, or to stop or injure the business of a person or shorten his life, or to give success in business, enterprise, speculation and games of chance, or to win the affection of a person, or to make one person marry anther, or to induce a person to make or alter a will, or to tell where money or other property is hidden, or tell where to dig for treasure, or to make a person dispose of property in favor of another."

Pennsylvania's statute has never been constitutionally challenged on free speech grounds, but religious supplications present a more ambiguous issue. In *Com. v. Blair*, 92 Pa. Super 169 (1927), the court came close to implying a possible free-exercise issue. A man styling himself Rev. David B. Blair had "mumbled" over the undercover policeman and advised him, as a cure to whatever malady the cop was fabricating, to put salt in his shoes and his bed, and had made mysterious hand motions over his companion, an undercover investigative reporter. When asked, he stated that he would accept whatever contribution the clients wanted to make. He was charged with "for gain or lucre, pretending to affect certain purposes by spells, charms, necromancy or incantations." In dismissing the charges, our Superior Court wrote: "There are pretenders in every form of religion. We must accord to everyone the right to believe and assert that prayer will heal the sick. There are thousands of people who resort to religious healers for the cure of disease and contribute money to those who minister to them for such purpose. It was not to restrain such religious organizations from putting in practice their beliefs in this regard that the act of assembly under which the defendant was indicted was passed."

**\*25** The defense that she was conducting religious meetings as a member of a spiritualist church did not avail the defendant in *Com. v. O'Malley*, 81 Pa. Super 100 (1923), probably because the defendant appeared to be a "congregation" of one. This is one of the very few reported cases where a conviction under the statute was upheld.

**Pennsylvania's Past: The Pow-wow**

Leaving aside the issues of healing and prophecy, what brought all of the above magical activities to the minds of our state's Legislature in 1861, and led it to leave the archaic language unchanged in 1939 and 1972? I suspect it may be the widespread practice of German folk magic, the *Braucherei*, a word often translated as "The Necessary."

As everyone knows, many German-speakers came to Penn's Woods from the inception of the colony, lured by Penn's generous land grants and, in the case of separatist groups, religious tolerance. Germantown, the first recorded German settlement in the English colonies, was founded in 1683. Between 1727 and 1775, approximately 65,000 German speakers (there was no nation of "Germany" before 1871) arrived in Philadelphia and settled the region and Germanophone immigrants who had disembarked elsewhere headed for established German-speaking outposts in our commonwealth. (German Society of Pa., *German Settlement in Pennsylvania: An Overview*). And they brought along their folk-magic spells and remedies.

But hang on there! I know you're picturing black buggies and black bonnets. No, our most famous and visible "Pennsylvania Dutch," the separatist sects, Amish and Mennonites, the "plain" Germans, abhorred any kind of magical practice or spielwerk. As anyone who has visited their territory knows, the "Old Orders" of these sects do not even build churches; it would be overweening presumption for men to think they could construct an abode for the Almighty. And those colorful "hex signs" you see on barns and in gift shops in Lancaster County? They're just folk art. It was among the "fancy" Germans, wealthy, worldly farmers, that the *Braucherei* spielwerk continued to flourish. If these "church Germans" wanted to protect their barns from fire, they'd post a *Himmelsbrief*, "letter from heaven," believed to be a miraculously-appearing sermon, which newspapers in York used **\*26** to publish broadside as a public service for that very purpose, or perhaps the Sator Square or the abracadabra: There are fragments of alchemical lore interwoven with the folk magic.

The *Braucherei* as an oral tradition had been passed down through generations, well established before the 19th century. But in 1819, at Reading, Berks County, John George Hohman (or possibly Hoffman; it's difficult to tell in Fraktur, the Gothic "broken script" used to write and print German until the 1940s) compiled various spells, incantations and rituals, and published a manual for *brauchers: Der Lange Verborgene Freund*, soon published in English as *Pow-wows, or, The Long-Lost Friend. A Collection of Mysterious and Invaluable Arts and Remedies for Man as Well as Animals*. (You can get it on your Kindle for 99 cents.)

Possibly anticipating some kind of religious or enlightenment prejudice against magical ritual, Hohman affirms in his preface: "I, Hohman, too, have some knowledge of the Scriptures, and I know when to pray and call upon the Lord for assistance. ... I place myself upon the broad platform of the liberty of the press and of conscience, in regard to this useful book, and it shall ever be my most heartfelt desire that all men might have an opportunity of using it to their good, in the name of Jesus."

Are you wondering why *Braucherei* came to be called in English "Pow-wow"? Everybody does! And nobody knows!

The *Braucherei* could be seen as a reaction to "black magic" witchcraft with which all Europe was obsessed from the 15th through 18th centuries. In the areas of Europe from whence Pennsylvania's settlers came, 40-60,000 German-speaking people had been put to death as witches in creative and unpleasant ways in that period. The carnage was exacerbated after the Reformation as Catholics and Protestants enthusiastically demonized and denounced each other. Our German-speaking immigrants, of devout Lutheran or other Christian sects, would not have wanted to practice **\*27** black magic, devil worship or other malign practices like casting curses, but they had good reason to believe in their reality and efficacy and to want protection from such arts. Pow-wow is "white magic," aimed at counteracting evil influences, restoring health, possessions or prosperity of which a person has been deprived wrongfully or by an evil chance.

A perusal of the "Index to Arts and Remedies" in *The Long-Lost Friend* shows that Pow-wow practice included spells and rituals to effectuate many purposes that are mentioned in 18 Pa.C.S.A. 1704: How to obtain things desired, how to recover stolen goods, to prevent malicious persons from doing injury, to compel a thief to return stolen goods, to retain the right in a court of justice, to remove enmity between two persons, how to relieve persons or animals after being bewitched, to retain the right in court and council, to win every game one engages in, to release spell-bound persons.

Were these rituals being performed "for gain or lucre"? It seems that, in what used to be the ancient convention of all professions, including medicine and law, brauchers did not expressly charge for their services, but much as with ministers who officiate at weddings or funerals today, a "gift" was expected. A person with a successful Pow-wow practice could comfortably supplement his or her income.

When my father began his medical practice in Monroe County in the 1950s, people would call and inquire whether he did the Pow-wow as casually as today they might ask whether they could get a flu shot at the office. But by the time I developed a scholarly interest in the craft about a decade ago, I wasn't able to locate anyone who was still doing it, though there were plenty of older people who had heard tell of even older relatives who were brauchers. Except for elements of it plucked out of context and cobbled into New Age syncretisms, the craft seems to have died out in Pennsylvania. (If you want to know more about Powwow, the Pennsylvania German Cultural Heritage Center at Kutztown University is the place to consult.)

The demise of Pow-wow is not entirely attributable to the passage of time; it has to do with the sequelae of a 20th century witchcraft trial in our commonwealth.

**A Portentous Proceeding**

In 1929 in York County, one aspiring Pow-wow practitioner, John Blymire, with two accomplices, Messrs. Curry and Hess, also dabblers in the craft, killed another practitioner, Nelson Rehmeyer. Rehmeyer was a very successful Pow-wow practitioner and farmer. Blymire wasn't having much success with his Pow-wow practice. In addition, he was unable to eat or sleep. He became convinced he had been hexed. He consulted quite a few other Pow-wow practitioners, but to no avail.

Finally he sought out a woman named Emma Knoll (or possibly Knopf, Knopt of Knoff; Fraktur again.) She revealed Rehmeyer to Blymire by a trick with a silver coin (or possibly a dollar bill: This is a good time to tell you that this is an oft-told tale and, if you research it, you will find variations in the names and details.) She counseled him to steal Rehmeyer's spellbook, his copy of *The Long Lost Friend*, in order to destroy his power or, failing that, to obtain a lock of Rehmeyer's hair and bury it six-feet deep.

I suspect Mrs. Knoll was not a braucher, but an old-fashioned black-magic Hecate witch. This kind of malign, sympathetic magic is not Pow-wow, which is a "white" magic aimed at healing and restoration, firmly rooted in Christianity. And, as a dread grimoire, an arcane spellbook within which a sorcerer's power was traditionally believed to be corporeally embodied, *The Long Lost Friend* is something of an anticlimax. In addition to healing remedies and those mentioned above, it contains recipes for making beer, paper, ink and detailed explanations **\*28** for how to perform card tricks. It is, as its title presages, a friendly, folksy, practical little tome. Most significantly, a Pow-wow practitioner's true grimoire is not Hohman's manual: it is the Holy Bible itself. The most powerful incantation available to a braucher is Ezekiel 16:6: "And when I passed by thee, and saw thee polluted in thine own blood, I said unto thee when thou wast in thy blood, Live; yea, I said unto thee when thou wast in thy blood, Live." (KJV).

Blymire and the two young men, all of whom had known Rehmeyer all their lives, went to Rehmeyer's house, and sat down to dinner with him, all the while looking surreptitiously around for Rehmeyer's copy of *The Long Lost Friend*. They didn't see it. (I doubt he had one; he would have known the rituals and incantations by heart since his initiation into Pow-wow at puberty.) So, they went for the lock of hair, but Rehmeyer, a hale and hearty 60-year-old farmer, didn't consent to be barbered. In the scuffle, one of the three hit him over the head with a blunt object and killed him. To cover up their crime, Blymire, et al., set fire to Rehmeyer's farmhouse, but the heat wasn't anywhere near sufficient to incinerate a corpse. It only burned out the dining room floor, and Rehmeyer's body fell through to the basement.

Everyone in York knew that Blymire was jealous of Rehmeyer's very successful Powwow practice and knew that Blymire had developed an idée fixe that Rehmeyer had "hexed" him. So when Rehmeyer's charred body was discovered, Blymire and his two accomplices were quickly arrested and charged with murder.

The trial became known as "The York Witch Trial" and attracted nationwide attention. And as the parade of parties and witnesses proceeded, it emerged that nearly everybody in York was either a Pow-wow practitioner or a client: Knoll, Rehmeyer, Blymire, Curry, Hess, the practitioners who had trained each of them in their **\*29** craft, people who had consulted Rehmeyer or Blymire. ... it was ubiquitous! Blymire and his accomplices were convicted. Only Curry appealed his conviction, which the Pa. Supreme Court sustained. *Com. v. Curry*, 298 Pa. 363, 148 A. 508 (1930).

Unfortunately, the three defendants weren't the only ones on trial: The commonwealth itself stood accused, too! Editorials were published all over the country putting the blame for the killing on Pennsylvania, which had allowed such benighted, superstitious nonsense to proliferate within its borders. As a result, the public schools in the state were instructed to teach against and disparage the German folk magic and the Pennsylvania German dialect.

The ubiquity of German folk magic practices in Pennsylvania may have been the reason our statute was originally so much more extensive than other states' and also the reason why, in 1939 and 1972, the 1861 language explicitly criminalizing the now-embarrassing practices was reenacted without substantial change.

**You Can Scry If You Want To!**

There have been few reported convictions under 18 Pa.C.S.A. 7104 and its predecessor. In *Com. v. Viscount*, 118 Pa. Super 595, 179 A. 858 (1935), a woman was convicted of fortune-telling for promising a person that she could make a man love her and pretending, for gain, that she could remove a deadly curse. In *Com. v. Dice,* 38 York 41 (1924), proof that defendant had represented to a private investigator that for a fee he would remove a spell cast against the informer was held sufficient to sustain an indictment under the statute, although the judge pointed out that the facts also might have supported a charge of false pretenses.

In Lebanon County in 1999, a woman who exacted a modest fee for "readings" was charged with violating Section 7104, to the displeasure of her neighbors who felt the police would be better occupied with "real crime." (https://old.post-gazette.com/magazine/19990119psychic1.asp).

In 2015, a self-styled seer aptly surnamed Uwanawich, of Philadelphia, was charged with 55 counts of fortune-telling, theft by unlawful taking and theft by deception, according to Findlaw.com. There is no reported case under that name, so I assume it was pleaded.

On Oct. 1, 2015, "Main Line Psychic" Semeinta Siganoff was charged with theft by deception and fortune-telling, having allegedly "gained" $24,000 from a single client. Again there is no reported case bearing the defendant's name.

**\*30**  The client has nothing to lose by reporting the fortune-teller; it isn't a crime to consult the seer, and Section 7104 specifically provides, "any person whose fortune may have been told shall be a competent witness against the person charged with violating the section."

The statute also provides that any advertisement that one can predict future events may be given in evidence to sustain the indictment. But, if you enter "Pennsylvania: Best Psychic" in your favorite search box, you will find a host of psychics and "mediums" (necromancy, meaning contacting the dead, is also forbidden under the statute) and many openly list their hourly or per session charges.

Judging from the sophisticated quality of the advertisements and published client reviews, it appears the Commonwealth is missing out on considerable revenue here: We should license fortune-tellers, like we do every other possible personal service, from hair-braiding to major surgery. (But then the Legislature would have to create a "State Board of Divination and Necromancy," and Purdon's Title 63 is voluminous enough already.)

Note that 7104 is within Chapter 71 of Title 18, Sports and Amusements. If a practitioner is receiving "gain or lucre" in order to entertain the customer, rather than for his or her advice as to the future or other particular knowledge, (s)he is not violating 7104. The talismanic word "entertainment" appears in some but not all of the online advertisements. In September 2019, a "Paranormal and Psychic Weekend" was advertised in Easton, and tickets were sold for $45 to $140, depending on how much "paranormality" a customer wanted to experience. I assume the psychics there were being paid only to entertain, although I wonder whether the ticket-buyers saw it that way.

In researching reported interviews with various paranormal practitioners, I have  **\*31**  also encountered the defensive argument that, if they do venture into predicting the occurrence of some future event, it is never absolute: They are "reading" the client's

propensities, but the client still has his or her "free will" and can alter the predicted course of events. Advising clients as to the likely future consequences of their choices is pretty much what we lawyers do, too.

**Thin Boo Line?**

Somewhat incongruously, "clients" of psychic practitioners include law enforcement. On the federal level, the Department of Justice has published a how-to guide, "Use of Psychics in Law Enforcement" (Approved for Release 2000/08/07: CIA-RDP96-00788R000100280009-3). It indicates that psychics should be compensated for expenses, and does not expressly prohibit paying them for their skill.

In 2005, Centre County District Attorney Ray Gricar went missing, and the detective in charge reported to the *Pittsburgh Post-Gazette* that he consulted a psychic for guidance in the search every day, one he had consulted before in a missing person case (although that one, like Gricar's, was never solved).

A woman in western Pennsylvania bills herself as a "psychic detective" and has reportedly assisted police in Pennsylvania (and elsewhere) on 400 cases, at a rate of $50 an hour. (https://old.post-gazette.com/magazine/19990119psychic1.asp). You can find and listen to a recording on the internet from "Essential Pittsburgh" (Oct. 30, 2015), about two psychic sisters who are allegedly often sought out by the local police, for whom they intuit free of charge.

When I started writing this, it seemed merely ludicrous to me that law enforcement officials would deal in any way with fortune-tellers, psychics, spiritualists and their ilk, and sometimes even compensate them for their services in flagrant violation of the statute. But in practice, police and detectives can't ignore anyone who claims to have knowledge about a crime they're investigating, and they routinely have to deal with unreliable and compromised informants like jailhouse snitches and people whose mental capacity is impaired by addiction or mental illness. Someone claiming a supernatural source for knowledge about a theft or a missing person may have gained that knowledge through actual involvement in the crime or abduction or through contact with the perpetrator. In high-profile cases such as Elizabeth Smart's and Natalie Holloway's, psychics seeking to raise their own profiles often come forward unsolicited or offer their insights to the desperate family members of the victim, who then pass the leads on to the detectives and insist on follow-up.

**"Relative" Impunity?**

It appears that generally, Pennsylvanians can get away with practicing fortunetelling, necromancy, spiritualism and the other spellwork set out in Section 7104, even if they do it for gain, so long as their clients are happy with them and don't get the idea that they've been deceived. Additionally, they can charge for divining the future, as long as they purport only to "entertain."

But why would anyone pay for that? If you find it entertaining to hear someone prognosticate on your future, just ask your spouse, your parents or your in-laws. I predict they'll do it for free!

**Footnotes**

| | |
|---|---|
| [a1] | Emeline L. K. Diener is an attorney in Pocono Lake, Monroe County. She is of counsel with MHK Attorneys, Pocono Summit. She can be reached at elkdesq@aol.com. |
| | If you would like to comment on this article for publication in our next issue, please send an email to editor@pabar.org. |

42-DEC PALAW 22

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.