**38-OCT Pa. Law. 47**

**Pennsylvania Lawyer**
September/October, 2016

**Feature**

Craig R. Shagin [a1]

Copyright © 2016 by The Pennsylvania Bar Association; Craig R. Shagin

# THE 'FAME' OF A WITCH
## Before Salem, There Was a Witchcraft Trial in Philadelphia the Curious Case of Margaret Mattson and Yeshro Hendrickson

**N**ine years before Abigail Williams first screamed, "Witch!" in Salem Village, Massachusetts, Margaret Mattson and Yeshro Hendrickson were brought before William Perm and the Provincial Council in Pennsylvania to be "Examined and About to be proved Witches." Here, recorded too succinctly in the provincial records, we have insight into the manner and quality of justice in nascent Pennsylvania.

The significance of this trial cannot be understood without knowing the law of witchcraft in 17th century England. King James I, whose name is imprinted on the most beautiful version of the English *Bible*, also gave us this in 1604:

> An Act against conjuration, witchcraft, and dealing with evil and wicked spirits. The penalty for practicing of invocation or conjuration, &c. conjuration or invocation whereby any person is killed or lamed. Declaring by witchcraft, where any thing is hidden, procuring unlawful love, &c. The second offense felony. No forfeiture of dower or inheritance. Trial of a peer of the realm.

The vagueness of the statute was typical. The elements of most offenses were developed as principles of common law. Felons at common law typically escheated their property to the crown upon execution. However, the Act of 1604 allowed spouses and children to inherit. This might have been a concession to the desire for family members to testify against each other. Who better to make an accusation against a witch than a disgruntled husband?

**\*48** Prosecution of those exercising supernatural powers presented problems. Consorting with the devil might be the worst evil, but actual evidence of it was poor. The invisible world is not amenable to tangible evidence, after all Alibis mean nothing, time and space can be bent by magical powers and the devil, the ultimate deceiver, can bewitch the truth-finding process, making those accused speak words that appear to confirm innocence.

Alan MacFarlane, in his book *Witchcraft in Tudor and Stuart Englandy* noted that these difficulties resulted in a more permissive prosecution of alleged witchcraft. The normal requirement of evidence was either a confession in open court or two direct witnesses. In cases of witchcraft, however, "if there were any likelihood, and suspicion, and common fame--that was proof enough."

Enhanced interrogations were encouraged. One justice declared that "those witches who did not confess 'shall be burnt and hanged."' Testimony of ill will and unexplained ill effects was sufficient since no man not involved in the enterprise was likely to view the act of conjuring evil spirits. A manual for justices of the peace advised that "half proofes are to be allowed, and good causes of suspition." It was permissible for testimony to be unrelated to facts or to include events that took place years before the accusation. Evidence on character and reputation were sufficient to convict. Similarly, great stress was placed on other indirect evidence, and the justices were advised to obtain evidence about the following:

> His parents, if they were wicked, and given to the same kind of fault. ... His nature; if civill, or hastie, wittie and subtill, a quarreler, pilferer, or bloudie minded ... His trade; for if a man liveth idly or vagrant ... it is a good cause to arrest him upon suspition, if there have been any felony committed. His companie with any of the offenders. His course of life ... if a common Alehouse-haunter, or ryottous in dyet, play or apparel. Whether he be of evill fame, or report.

Sorcery and witchcraft had been capital offenses in England since the introduction of Christianity. (There was biblical support: "Do not allow a sorceress to live." *Exodus* 22:18.) A history of English law by Sir Frederick Pollock and Frederic William Maitland reports there were 109 hangings of witches between 1644 and the death of the Puritan Lord Protector Oliver Cromwell in 1658. However, at least in Essex, there were reports of witches in some circumstances receiving punishments of a years imprisonment. Given the conditions of the "gaols" of the day, these sentences were often death by "gaol fever."

Thus, on Feb. 7, 1683 (Under the Julian calendar, February was then the 12th month.), about a year and a half after the ship *Welcome* landed with William Penn and the first purchasers, the charge was presented to the Provincial Council: "Margaret Mattson and Yeshro Hendrickson, Examined and About to be proved Witches; whereupon, this board Ordered that Neels Matson should Enter into a recognizance of fifty pounds for his Wife's appearance before this board the 27th Instant," and Jacob Hendrickson "doth the same for his Wife."

**\*49** On the morning of Feb. 27, William Penn, presiding over a council of seven members, convened a grand jury of 21 men. There is no record of the evidence the attorney general presented to the grand jury, but by the afternoon it "found the Bill." The record states that "Margant Matson's Indictment was read, and she pleads not Guilty and will be tryed by the Countrey" A jury of 12 men was then selected and a person named Lasse Cock was appointed as interpreter for Mattson and Hendrickson. Adding to the prospects for the prosecution, the accused, were Swedes.

In the provincial records is a garbled summary in rough language and rougher spelling. Important strands of the narrative vanish in the brew. Henry Drystreet, who was also a member of the grand jury that indicted Mattson, attested that he had been told 20 years before that she was a witch and that several cows had been bewitched by her. He further testified that James Saunderling's mother told him that [Mattson] had bewitched her cow "but after wards said it was a mistake, and that her Cow should doe well againe, for it was not her Cow but an Other Person's that should dye."

Charles Ashcom said that "Anthony's Wife [Mattson's daughter] being asked why she sould her Cattle" replied that it was "because her mother had Bewitcht them, having taken the Witchcraft of Hendricks Cattle and put it on their Oxon" so that "[s]he myght Keep but noe other Cattle." Further, he testified that Mattson's daughter had told him one night about a strange occurrence, when "there was a great Light but Just before, and an Old woman with a Knife in her hand" appeared at the "Bedd's feet, and ... cryd out and desired Jno. Symcock to take away his Calves, or Else she would send them to Hell."

A woman named Annakey Coolin testified that her husband "tooke the Heart of a Calfe that Dyed, as they thought, by Witchcraft, and Boyled it, whereupon the Prisoner at ye Barr came in and asked them what they were doing; they said boyling of Flesh; she said they had better they had Boyled the Bones, with severall other unseemly Expressions."

And now came Mattson, without an attorney, arguing that Drystreets evidence should not be credited, but that if Saunderling's mother had come "she would have answered her" directly. She denied Ashcorn's attestation "at her Soul, and Saith where is my Daughter; let her come and say so." As to the calf's heart, she claimed "she never said any such things." She presented "Jno. [Sym]Cock," who attested that "he knows nothing of the matter." Finally, and quite correctly, after denying all the statements by the witnesses against her, she protested that they "speake only by hear say."

This would have been more than sufficient evidence for the gallows in Essex and indeed was, nine years later, in Salem.

Penn gave the jury their charge. Although no record was kept of the charge, we can see from the jury's finding--"Guilty of haveing the Comon fame of a witch, but not guilty in manner and forme as Shee stands Indicted"--that Penn must have instructed that these were separate crimes rather than the former being proof of the latter. The tantalizing question is. Why? Neels Mattson and Anthony Neelson were required to post 50 pounds each for the "good behavior of Margaret Matson for six months" and

Jacob Hendrickson was required to do the same for the "good behavior" of his wife for the same period. There were then 240 pence to an English pound. Hemp was permitted to be exchanged as currency, at 4 pence for each pound of hemp. Hence, 50 English pounds was the equivalent of 3,000 pounds of hemp. Grown in colonial conditions, this would likely have required two acres of land for an entire year of cultivation. Five shillings seems to have been the default fine for the lesser offenses--cursing or taking the Lord's name in vain--and that was juxtaposed with "or five days in the house of corrections." So we could conclude that the loss of a shilling was equated with a day. There were 20 shillings to 1 pound or 1,000 shillings to 50 pounds. Following the formula on the other offenses, 50 pounds would have been the equivalent of 1,000 days in jail. This was a substantial sum of money posted to ensure "good behavior."

Historians have the advantage of hindsight. We know how things developed until our own day. This advantage comes with a significant disadvantage. It is impossible to divest ourselves of our current knowledge and imagine things as understood at the time they occurred. The things that a historian cannot know but desperately wants to know are the full sensibilities of the time. What did it feel like to be alive in 1683 Pennsylvania? It is impossible to hold in one's mind thoughts of another era that are not polluted by the ideas acquired thereafter. However, we can whittle away some of the accretions of time at least to appreciate the remarkableness of this verdict.

Some suggested that Penn's verdict was mocking the idea of witchcraft itself. This is doubtful. The 17th century was replete with witch trials. George Fox, the founder **\*50** of Quakerism whose preaching influenced a young William Penn, certainly believed in the reality of witches and sorcery. Fox wrote in his journal, "As I was going to a meeting, I saw some Women in a Field, and I discerned them to be Witches and I was moved to go out of my way into the Field to them and declare unto them their Conditions: telling them plainly, They were in the Spirit of Witchcraft."

Theologically, witchcraft and sorcery were credible evils. Contrary to the Lord's Prayer, the perpetrator was not letting *"Thy* will be done" but by magic spells seeking to alter events so that *"his own* will would be done." Doing this in league with the devil was the essence of evil. Any clouding of "the inner light of the Christ within'" offended Penn and he saw it as the provenance of social ill. As he noted in the first Frame of Government of Pennsylvania:

> That as a careless and corrupt administration of justice draws the wrath of God upon magistrates, so the wildness and looseness of the people provoke the indignation of God against a country; therefore, that all such offenses against God, as swearing, cursing, lying, prophane talking, drunk-enness, drinking of healths, obscene words, incest, sodomy, rapes, whoredom, fornication, and other uncleanness (not to be repeated) all treasons, misprisions, murders, duels,. felony, seditions, maims, forcible entries, and other violences, to the persons and estates of the inhabitants within this province; all prizes, stage-plays, cards, dice, May-games, gamesters, masques, revels, bull-baitings, cock-fightings, bear-battings, and the like, which excite the people to rudeness, cruelty, looseness, and irreligion, shall be respectively discouraged, and severely punished. ...

There were not only false accusations of witchcraft in the 17th century but false claims to it as well. There were books of incantations, spells and herbal medicines mixed with rituals that circulated following the introduction of the printing press. Michel de Nostradamus' *Les Propheties* first appeared in 1555 (and remains popular along with any number of books on the occult that appear in modern bookstores). There were reported cases of men being caught robbing graves, heads and body parts in hand, admitting that the same were to be used in dark rituals. Many of the practitioners were seen as charlatans; others were believed and executed as authentic. Some who doubted the efficacy of witchcraft itself nonetheless held that efforts to practice it were an attempt at evil and as such justified capital punishment.

The 17th century was a dark time with a far greater invisible world to be reconciled. In many huts, candles were a luxury that could not be afforded when food itself was dear. Books were rare and those who could read them rarer. There was no public lighting. The causes of most things important were not understood: disease, birth defects, crop failures and madness were mysteries. In England, Isaac Newton was just beginning to decode the mathematics of the planets. Here, life on the edge of a forest must have inspired a particular sense of foreboding. Villages were isolated; the forests contained the mystery of an unexplored land out of which came native Americans decorated in paint and half-clothed in deer-skin hides, oblivious to the thirsts of Europe and engaged in rituals foreign and frightening.

While it is unlikely that Penn discounted the existence of sorcery or witchcraft altogether, it is entirely likely that he doubted its evil at every accusation. Many of the early Quakers, including Penn, were imprisoned and adjudged criminals in England.

Penn had also studied law at Lincoln's Inn. No doubt both in his professional capacity and as an inmate Penn had contact with the range of miscreants and unfortunate non-miscreants who ended up in jail. He had a far greater firsthand experience of the criminal law, criminals, courts and punishments of his day than would today's average judge, let alone legislator (at least ***51** before leaving office). He witnessed the ease and inaccuracy with which accusations could be made. The Quakers themselves had been seen as diabolical agents and there were several accusations of witchcraft and sorcery made against them. One of my favorite tracts, "The Quakers' Fiery Beacon, or the Shaking Ranter's Ghost," noted, "[I]t is evident by some late instances that they are Anti-magisterical as well as Anti-ministerial. Yea that these Quakers use in-chanted Potions, Bracelets, Ribons, Sorcery and Witch-craft to intoxicate their Novices and draw them to their party."

The trial of Margaret Mattson and Yeshro Hendrickson ended without a hanging. This, I believe, was not because Penn recognized that witchcraft and the evil it represented were imaginings. Rather, it was because of something far more virtuous: the courage to doubt guilt, even when to be wrong in that judgment would mean permitting "evil-doers" to leave the court and enter the fragile world of this small colony on the edge of the forest.

Modern-day Wiccans gather in Salem every Halloween, even though the primary scene of that crime was Salem Village (now operating under the alias of Danvers), in a sort of pilgrimage to the 20 innocent people and two dogs executed for witchcraft. No tourists flock nor has a day been set to celebrate the quiet courage of William Penn to act on his doubts and refuse to hang those he was not convinced were guilty. Wisdom often goes so unrewarded by posterity.

There is a postscript to Pennsylvania witchcraft. On June 24, 1736, over a half-century after Mattson and Hendrickson stood to be proved witches, the prosecution for the crime of witchcraft was outlawed in England. However, the crime of pretending to "exercise or use any kind of witchcraft, sorcery, enchantment or to undertake to tell fortunes or pretend from his skill or knowledge any occult crafty science" remained. This law still stands in the commonwealth. The Pennsylvania Crimes Code, Section 7104, still renders it a misdemeanor of the third degree if someone "pretends for gain or lucre, to tell fortunes or predict future events, by cards, tokens, the inspection of the head or hands ... or by consulting with the movements of the heavenly bodies, or ... pretends to effect any purpose by spells, charms, necromancy, or incantation, or advises the taking or administering what are commonly called love powders or potions, or ... pretends to enable anyone to get or to recover stolen property, or to ... give good luck, or to put bad luck on a person or animal. ..."

Thus morphed the crime of witchcraft. It fell from its proud perch as a capital crime against God to a mere consumer-protection violation.

## Footnotes

| | |
|---|---|
| a1 | Craig R. Shagin practices immigration law with The Shagin Law Group LLC in Harrisburg. He has written previously on historical topics for *The Pennsylvania Lawyer* and has been working on a study of the criminal law and the law of the legal status of persons in provincial Pennsylvania from the time of William Penn to the presidency of George Washington. He can be reached at cshagin@shaginlaw.com.<br><br>If you would like to comment on this article for publication in out next issue, please send an email to editor@pabar.org. |

38-OCT PALAW 47